**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**SIERRA CLUB**, *et al.*,

        Plaintiffs,

v.                                                               Civil Action No. 2:11-CV-23
                                                              Chief Judge John Preston Bailey

**ICG EASTERN, LLC**,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Currently pending before this Court is Defendant ICG Eastern, LLC's ("ICG") Motion to Dismiss [Doc. 6], filed April 25, 2011. The plaintiff responded to the Motion to Dismiss on May 12, 2011 [Doc. 9], and the defendant replied on May 23, 2011 [Doc. 10]. The Court has reviewed the record and the arguments set forth by the parties and, for the reasons set forth below, concludes that the Motion to Dismiss should be **GRANTED**.

**BACKGROUND**

**I.    Regulatory Structure**

Plaintiffs' claims are brought pursuant to the provisions for "citizen suits" found in section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a), and section 520(a) of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1270(a). A brief overview of the governing statutory and regulatory regimes will help to elucidate the issues before this Court.

    **A.    Clean Water Act**

The purpose of the Clean Water Act is "to restore and maintain the chemical,

1

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In service of those ends, the statute prohibits the "discharge of any pollutant by any person" unless such discharge complies with the provisions of the CWA. See 33 U.S.C. § 1342(a)(1). One such provision, codified at 33 U.S.C. § 1342, "established a National Pollution Discharge Elimination System ["NPDES"] . . . that is designed to prevent harmful discharges into the Nation's waters." *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Maryland*, 523 F.3d 453, 455-56 (2008) (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007)). NPDES requires dischargers to obtain permits that contain effluent limitations – restrictions on the type and quantity of pollutants that can be released into the water. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). In effect, the NPDES program transforms the generally applicable requirements of the CWA into specific obligations imposed upon individual polluters. *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976).

The Environmental Protection Agency ("EPA") initially administers the NPDES program for each state, but the states may apply for a transfer of permitting authority to state officials. *Nat'l Ass'n of Home Builders*, 551 U.S. at 650. Once authority is transferred, state officials are responsible for reviewing and approving NPDES permits. *Id.* However, the EPA retains an oversight role in the permitting process; the state must advise the EPA of each permit it proposes to issue, and the EPA may lodge an objection to any permit. *Id.* at 650 n.1 (citing 33 U.S.C. §§ 1342(d)(1), (2); 40 C.F.R. § 123.44(c)). If the state fails to resubmit a revised permit that satisfies the EPA's objection, authority

over the permit reverts to the EPA. *Id.* at 650 n.1 (citing 33 U.S.C. § 1342(d)(4)).

B.     **Surface Mining Control and Reclamation Act**

Congress enacted the SMCRA in order to ensure that "coal mining operations are so conducted as to protect the environment." 30 U.S.C. § 1202(d). Like the CWA, the SMCRA allows states to adopt their own regulatory programs, so long as those programs comply with the requirements of federal law.[1] See generally 30 U.S.C. § 1253. The West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"), West Virginia's regulatory program, empowers WVDEP to issue surface mining permits. See W.Va. Code § 22-3-2. Permits are subject to specific performance standards, and holders of such permits must meet all applicable standards. See 38 C.S.R. § 2-14. One standard mandated by the Act requires that mining activities be conducted in a manner which "prevent[s] material damage to the hydrologic balance outside the permit area." 38 C.S.R. § 2-14.5; see also 30 C.F.R. §§ 816.41(a), 817.41(a). A second standard directs that "[d]ischarge . . . shall not violate effluent limitations or cause a violation of applicable water quality standards." 38 C.S.R. § 2-14.5b; see also 30 C.F.R. §§ 816.42, 817.42. Applicable water quality standards include the effluent limitations imposed pursuant to the CWA; therefore, if a permittee violates the terms of its CWA permit, the permittee is also in

---

[1]Though SMCRA does assure that minimum national standards for surface mining are enforced, it delegates greater regulatory authority to the states than does the CWA. ***Bragg v. West Virginia Coal Ass'n***, 248 F.3d 275, 294 (4th Cir. 2001). The CWA "anticipates a partnership" between state and federal governments, in which regulatory authority is shared, ***Arkansas v. Oklahoma***, 503 U.S. 91, 101 (1992), whereas the SMCRA encourages "exclusive" state regulation in which standards are attained by state enforcement of its own law. ***Bragg***, 248 F.3d at 294; see 30 U.S.C. § 1253(a)(1). If a state fails to enforce those standards, it does not automatically forfeit its regulatory rights; rather, a process begins which may eventually lead to federal withdrawal of state authority. *Id.* (citing 30 U.S.C. §§ 1271, 1267).

3

violation of the performance standards imposed by its SMCRA permit.[2]

### C. Citizen Suits

The enforcement schemes established by both the CWA and SMCRA carve out a role for ordinary citizens, who are empowered to bring suit against polluters for their violations of the law. See 33 U.S.C. § 1365; 30 U.S.C. § 1270. Citizen suits, while not the primary mechanism of enforcement for either statute, "can serve as a check to ensure the state and federal governments are diligent in prosecuting . . . violations." **Piney Run**, 523 F.3d at 456. While citizen suit provisions are "critical" to the enforcement of these statutes, they are meant "to supplement rather than to supplant governmental action." **Id.** (quoting **Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.**, 484 U.S. 49, 60 (1987). Citizen suits are only proper, therefore, if governmental agencies "fail to exercise their enforcement responsibilities." **Gwaltney**, 484 U.S. at 60; see also **Envtl. Conserv. Org. v. City of Dallas**, 529 F.3d 519, 528 (5th Cir. 2008) ("The primary function of a citizen suit is to spur agency enforcement of the law.").

In service of that aim, Congress carefully restricted the right to bring a citizen suit. Both the CWA and SMRCA expressly stipulate that no citizen suit may be brought if the government "has commenced and is diligently prosecuting a civil or criminal action . . . to require compliance" with the CWA or SMCRA. 30 U.S.C. § 1270(b)(1)(B); see also 33 U.S.C. § 1365(b)(1)(B).

---

[2]Plaintiffs thus allege that because defendant is in violation of the terms of its WV/NPDES permit issued pursuant to the CWA, defendant is also in violation of the terms of its WVSCMRA permit issued pursuant to SMCRA. Plaintiffs' Complaint at ¶ 107.

4

## II.     Factual Background

This case arises out of a coal company's alleged noncompliance with the conditions of two permits issued pursuant to the Clean Water Act and the Surface Mining Control and Reclamation Act.  At all times relevant to this action, defendant ICG owned and operated the Knight-Ink No. 1 Surface Mine located in Webster County, West Virginia.  Plaintiffs' Complaint at ¶ 11.  That mine, which is regulated by WVSCMRA Permit S201988, discharges pollutants via several outfalls into the waters surrounding the mine.  See id. at ¶ 38.  Those discharges are regulated by WV/NPDES Permit WV0094889, which limits the type and quantity of pollutants which may permissibly be discharged.  See id. at ¶¶ 38-39.

### A.     Permit Requirements

Defendant's WV/NPDES permit places limits on, *inter alia*, the concentrations of selenium[3] that defendant may release into the water from eight discharge points: Outfalls 001, 002, 005, 014, 021, 031, 034, and 036.  Id. at ¶ 40.  Regulatory actions related to selenium are relatively new in West Virginia; it was not until 2003 that state and federal agencies realized the elevated potential of selenium pollution attendant to strip mining. *See* **Ohio Valley Envtl. Coal. v. Coal-Mac, Inc.**, — F.Supp.2d —, 2011 WL 1237643, *3 (S.D.W.Va. 2011).  Accordingly, defendant's WV/NPDES permit did not impose selenium limitations on defendant's Outfalls 031, 034, and 036 until July 2006.  See Plaintiffs' Complaint at ¶ 40.  Although selenium limitations were also placed on the other five outlets in question, the effective date of those limitations was delayed by a WVDEP order ("Order

---

[3]Selenium is a naturally occurring element that is common in the environment but toxic at high levels.  **Ohio Valley Envtl. Coal., Inc. v. Hobet Mining**, 723 F.Supp.2d 886, 900 (S.D.W.Va. 2010).

5

731") until April 2010. See id. at ¶ 42.

Order 731 also included a compliance schedule which required ICG to begin construction of selenium treatment facilities by October 2008, and to complete the installation of such facilities by April 5, 2010, the same day the remaining limitations would go into effect. See id. at ¶ 43; Defendant's Exhibit 2 at 3. Additionally, Order 731 required that a more detailed plan for installation of the treatment facilities be submitted to WVDEP within one year, and stipulated that the plan would be "considered . . . a modification to the NDPES Permit." Defendant's Exhibit 2 at 3. In accordance with that requirement, ICG submitted its detailed plan in April 2008, which set forth a schedule for the construction and installation of wetland treatment facilities at Outlets 001, 002, 005, 014, and 021. Defendant's Exhibit 3 at 5. The plan was approved by WVDEP on April 8, and appended to ICG's WV/NPDES permit. Defendant's Exhibit 3 at 1.

In October 2009, ICG applied to WVDEP for another modification of its permit which would extend the April 5, 2010 effective date for the selenium limitations at Outfalls 001, 002, 005, 014, and 021 until July 1, 2012. See id. at ¶ 46; Defendant's Memorandum of Law at 3. In February 2010, WVDEP gave public notice of its intent to grant the requested extension. Id. at ¶ 47. However, in March 2010, the Environmental Protection Agency filed a formal objection to the extension, halting the permit modification process. Id. at ¶¶ 47-48. On April 2, 2010, three days before the selenium limitations were slated to take effect, WVDEP had not yet resolved the EPA's objection or made a final decision regarding the permit modification; thus, ICG filed an administrative appeal with the West Virginia Environmental Quality Board which (1) challenged the timeliness of WVDEP's decisionmaking process with respect to the requested permit modification and (2)

requested that the selenium limitations be stayed from taking effect pending disposition of the appeal. Id. at ¶ 51; see Defendant's Exhibit 5 at 2-3. The EQB granted the stay. Defendant's Exhibit 5 at 26-27. Concurrently with filing its appeal and request for stay with the EQB, ICG also filed a petition with the Circuit Court of Kanawha County requesting that the selenium limitations be enjoined from taking effect. See Defendant's Exhibit 7. The Kanawha County court granted the requested injunction. Id.

Because WVDEP was unable to resolve the EPA's objection, ICG's permit modification request was ultimately denied. Id. at ¶ 48; Defendant's Memorandum of Law at 4. In September 2010, ICG filed an appeal of the denial with the EQB, which included a request that the previously granted stay be extended to apply to the new appeal. See Defendant's Exhibit 8. A hearing in the new appeal, set for February 2011, was continued on ICG's motion pending the outcome of the Webster County action described below. See Plaintiffs' Exhibit 1.

### B. The Webster County Action

On April 14, 2010, plaintiffs sent a Notice of Intent letter ("NOI") to ICG, informing the company of its alleged effluent violations and expressing intent to file suit at the end of the statutory 60-day waiting period. Plaintiffs' Complaint at ¶¶ 59-60. Three days prior to the expiration of that waiting period, WVDEP filed suit against ICG in the Circuit Court of Webster County, West Virginia. Id. at ¶ 63. About six months later, WVDEP released for public comment a proposed Consent Decree ("Draft Consent Decree"), which if ultimately approved would resolve the Webster County action. Id. at ¶ 64. The terms of the Draft Consent Decree set forth a schedule of tiered interim limitations on selenium

7

discharges at all eight outfalls, coupled with increasingly heavy daily fines for violation of those interim limits as the final compliance dates approach. Defendant's Exhibit 11 at 14-20. Those final selenium compliance limitations will be enforced beginning on August 1, 2012 for Outfalls 001, 002, 005, 006, and 014, and on December 1, 2012 for Outfalls 007, 021, 031, 034, and 036.[4] For settlement of ICG's past effluent violations, the Draft Consent Decree orders ICG to pay WVDEP a civil penalty of $288,750.00. Id. at ¶¶ 64, 72.

### III. Procedural History

On March 23, 2011, plaintiffs filed suit against ICG Eastern in the United States District Court for the Northern District of West Virginia based on federal question jurisdiction, pursuant to 28 U.S.C. § 1331, and the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365, and the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270. The Complaint [Doc. 2] brings three Claims for Relief: first, for violations of the effluent limitations of defendant's WV/NPDES permit, actionable under the CWA; second, for violation of the terms of Order 731, also actionable under the CWA; and third, for violation of the performance standards of defendant's WVSCMRA permit, actionable under SMCRA. Plaintiffs seek declaratory and injunctive relief from this Court.

### STANDARD OF REVIEW

Defendant moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming, *inter alia*, that plaintiffs' suit is precluded under the CWA and SMCRA. The plaintiff bears the burden of proving that subject matter jurisdiction exists.

---

[4] Final effluent limits for Outfalls 031, 034 and 036, which have been in effect since July 2006, were not subject to the permit modifications requested by ICG.

*See, e.g.*, ***Evans v. B.F. Perkins Co.***, 166 F.3d 642, 647 (4th Cir. 1999). Challenges to jurisdiction under Rule 12(b)(1) may be raised in two critically different ways. First, the movant may argue that the complaint *fails to allege* facts upon which subject matter jurisdiction can be based. *E.g.*, ***Adams v. Bain***, 697 F.2d 1213, 1219 (4th Cir. 1982). In that case, all the facts alleged in the complaint are assumed to be true and all reasonable inferences are drawn in favor of the nonmovant. *See **id.*** Second, the movant may challenge the *veracity* of the material jurisdictional facts. ***Id.*** In that type of challenge – the type presented by this action – "[u]nlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction," and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. ***Id.***

## DISCUSSION

**I.     Jurisdiction Over Plaintiffs' Claims as to Effluent Limit Violations**

Both the CWA and SMCRA bar citizens from suing if the federal or state government has already commenced, and is "diligently prosecuting," an enforcement action "to require compliance with [the law]." ***Piney Run***, 523 F.3d at 456 (quoting ***Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.***, 528 U.S. 167, 175 (2000)); *see also **Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC***, 723 F.Supp.2d 886, 905 (S.D.W.Va. 2010). This "statutory bar is an exception to the jurisdiction granted [by the statutes], and jurisdiction is normally determined as of the time of the filing of a complaint." ***Piney Run***, 523 F.3d at 456 (quoting ***Chesapeake Bay Found. v. American Recovery***

9

*Co.*, 769 F.2d 207, 208 (4th Cir. 1985) (per curiam)).

Enforcement actions are considered "diligent" if they are "capable of requiring compliance with the Act and [are] in good faith calculated to do so," and as both parties to this action acknowledge, diligence is presumed. *Piney Run*, 523 F.3d at 459. Citizen-plaintiffs bear a heavy burden when challenging the diligence of a prosecution; merely showing that the government's prosecution is less aggressive than plaintiffs would prefer is insufficient to overcome the presumption. *Id.*; *see also* ***Karr v. Hefner***, 475 F.3d 1192, 1198 (10th Cir. 2007). Moreover, when the government and the alleged polluter enter into a consent decree designed to cure violations of the CWA, courts "must be particularly deferential to the [government] agency's expertise." ***Piney Run***, 523 F.3d at 459. Such deference serves an important practical purpose: if citizens could file suit "in order to seek the civil penalties that [the government] chose to forgo, then [the government's] discretion to enforce the Act in the public interest would be curtailed considerably." ***Gwaltney***, 484 U.S. at 61. The deference owed, however, is not unlimited; the analysis requires more than "mere acceptance at face value of the potentially self-serving statements of a state agency and the violator." ***Hobet Mining***, 723 F.Supp.2d at 906.

It is undisputed that WVDEP was prosecuting an action against defendant in state court at the time plaintiffs filed their Complaint. As previously discussed, that action resulted in the drafting of a Consent Decree between WVDEP and defendant, which if approved would resolve the Webster County litigation. In spite of those uncontroverted facts, plaintiffs argue that this suit is not barred by the language of the citizen-suit provisions. First, plaintiffs contend, the Draft Consent Decree is not capable of requiring

10

defendant's compliance because (1) the fine it imposes for defendant's past violations is extremely small, and (2) it grants yet another deadline extension in a continual series of such extensions – thus giving defendant no meaningful incentives, pecuniary or otherwise, to obey its effluent limits. Second, plaintiffs suggest that WVDEP has acted in bad faith by "using a state court proceeding to preclude a real enforcement action" against defendant. Third, plaintiffs argue that the Webster County action does not seek to prosecute defendant for any violations which took place during the period of time in which the EQB and Kanawha County stays were in force. This Court holds, on the record before it, that plaintiffs have failed to meet their high burden of establishing that WVDEP's prosecution of defendant was not diligent.

### A. The Draft Consent Decree is Capable of Requiring Compliance

In this Court's view, it cannot convincingly be contended that the Draft Consent Decree between defendant and WVDEP is incapable of requiring compliance with the permit limitations. The Draft Consent Decree requires that defendant immediately take measures to ensure compliance with all effluent limits and sets out a detailed plan to ensure compliance for the outfalls at issue in this litigation. Each outfall is subject to a triphasic effluent limitation schedule. Each phase levies increasingly significant fines for every day of violation, starting at $1,000/day and increasing to $10,000/day. Additionally, failure to conform to the deadlines for installation, reporting, and compliance set forth in the detailed plan triggers another tiered set of daily fines from $500/day to $1000/day over a 30-day period of time. In light of these significant financial incentives, the Draft Consent Decree is surely capable of requiring defendant's compliance. *See **Piney Run***, 523 F.3d

at 460.

Plaintiffs argue that the "unconscionably small" civil penalty imposed for defendant's past violations is evidence that the Draft Consent Decree cannot require compliance. But "a citizen-plaintiff cannot overcome the presumption of diligence by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result." *Id*. at 459. Although the fine is less than plaintiffs would have imposed themselves, that fact alone does not render WVDEP's prosecution lacking in diligence. See **Gwaltney**, 484 U.S. at 60-61; *see also* **City of Dallas**, 529 F.3d at 531 ("That [citizen-plaintiff] might have sought stiffer penalties against [polluter] does not change the result; [citizen-plaintiff] is not permitted to upset the primary enforcement role of the EPA by seeking civil penalties that the Administrator chose to forgo . . ."); **Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.**, 138 F.3d 351 (8th Cir. 1998) ("While [citizen-plaintiff] might have preferred more severe civil penalties, [the state enforcement agency] has the primary responsibility for enforcing the Clean Water Act."). Here, defendant is subject to a strict schedule of fines for future violations in addition to the cost it will incur by installing new treatment technologies to ensure its outfalls come into and remain in compliance.

Plaintiffs cite **Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.**, 890 F.Supp. 470 (D.S.C. 1995), for the proposition that a prosecution which does not recover the economic benefit of a polluter's noncompliance is non-diligent. Significantly, however, the Consent Order entered in **Laidlaw** purported to settle not only past violations of the polluter's effluent limits, but also *all future violations* of those limits. 890 F.Supp. at 490.

Unlike defendant in the instant action, the *Laidlaw* polluter was not subject to interim effluent limits and future fines designed to force compliance with the law; the fine imposed by the Consent Order represented the sum total of its pecuniary punishment. *Id.* Furthermore, the *Laidlaw* court "did not hold that [the failure to recover economic benefit], standing alone, would always support a finding of non-diligent prosecution . . . [t]he economic benefit issue was a factor, but was by no means the only factor, upon which the decision rest[ed]." Order on Motion for Reconsideration, *Laidlaw*, 890 F.Supp. at 498-99.

      **B.**    **WVDEP Has Not Acted in Bad Faith**

This Court is unpersuaded by plaintiffs' assertions that WVDEP's enforcement action was not in good faith calculated to require compliance. Plaintiffs point again to the size of the fine assessed against defendant and to the extension of final compliance dates in an attempt to substantiate their claims. In this Court's view, those matters provide no basis to impute a wrongful motive to WVDEP. The Webster County suit did not languish for a long period of time without action; only six months passed between the time the complaint was filed and lodging of the Draft Consent Decree. Cf. ***Jones v. City of Lakeland***, 224 F.3d 518, 522 (6th Cir. 2000) (10-year enforcement action which waived deadlines contained in four Consent Decrees not diligent). As previously discussed, the Draft Consent Decree requires defendant's immediate compliance with interim limitations and imposes a meaningful daily fine for any violations. "Government prosecution need not be zealous or far-reaching – only diligent." ***Piney Run***, 523 F.3d at 459 (quoting ***Karr***, 475 F.3d at 1197).

13

## C. Validity or Invalidity of the Stays is Irrelevant

Finally, plaintiffs argue that their First and Third Claims for Relief seek to prosecute defendant for certain violations not covered by WVDEP's Webster County complaint – specifically, any violations that occurred during the period of time the EQB and Kanawha County stays were in force. Plaintiffs allege that those stays were invalid, and therefore that WVDEP has not prosecuted defendant for any violations that fell within that window. This Court need not decide, however, whether the stays were valid to resolve the pertinent jurisdictional question. "The focus of the statutory bar to citizen's suits is . . . on whether corrective action already taken and diligently pursued by the government seeks to remedy the same violations as duplicative civilian action." ***N. and S. Rivers Watershed Ass'n, Inc. v. Town of Scituate***, 949 F.2d 552, 556 (1st Cir. 1991). The Draft Consent Decree orders defendant's compliance with "*all effluent limits* for *all* Outfalls 001-036" (emphasis added). That order unequivocally requires defendant to comply with *all* of its effluent limitations; plaintiffs' claims, therefore, are duplicative, as WVDEP has taken the appropriate corrective action.[5]

Because there is no basis upon which to conclude that WVDEP's prosecution of defendant for its effluent limitation violations is non-diligent, this Court holds that plaintiffs'

---

[5]Plaintiffs point out that WVDEP has reserved its right to seek future penalties for violations occurring during the time that the stays were in force. That reservation is not germane to the instant jurisdictional question because it was included in the *revised* Consent Decree, promulgated *after* plaintiffs filed their Complaint in this action. But even if the Draft Consent Decree had included such a reservation, this Court would be skeptical of its relevance to the diligent prosecution analysis. The primary purpose of a citizen suit is to cure a polluter's violations, not to levy pecuniary penalties. "Duplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well underway . . . are impediments to environmental remedy efforts." ***Scituate***, 949 F.2d at 556.

14

citizen suit as to their First and Third Claims for Relief is barred by statute. This holding, however, does not fully extinguish the jurisdictional inquiry.

## II. Jurisdiction Over Plaintiffs' Claims as to Order 731

As both parties agree, plaintiffs' Second Claim for Relief is not included in WVDEP's ongoing enforcement action, and is therefore not subject to the statutory bar concerning diligent prosecution. Order 731 required that defendant begin construction of selenium treatment facilities by October 2008 and that such construction be completed by April 2010. Plaintiffs allege in their Second Claim for Relief that defendant failed to meet those deadlines and thus is in ongoing violation of the Order, an actionable offense under the CWA.[6]

Article III of the Constitution mandates that a court hear only continuing cases and controversies. See **United States v. Ala. S.S. Co.**, 253 U.S. 113, 116 (1920). A case becomes moot when the issues presented are no longer "live," or when then parties lack a legally cognizable interest in the outcome. **Incumaa v. Ozmint**, 507 F.3d 281, 286 (4th Cir. 2007) (quoting **Powell v. McCormack**, 395 U.S. 486, 496 (1969)). If a case has been rendered moot, the federal courts are divested of subject matter jurisdiction to decide the questions it presents. **Simmons v. United Mortgage and Loan Inv., LLC**, 634 F.3d 754, 762 (4th Cir. 2011).

Developments in a government action subsequent to the filing of a citizen-plaintiff's

---

[6]Defendant additionally argues that plaintiffs' claims as to Order 731 must be dismissed because any violations of the Order are "wholly past," and therefore barred under **Gwaltney**, 484 U.S. at 58-59. However, under **Gwaltney**, a plaintiff need not actually *prove* that violations are currently occurring; all that is necessary to confer jurisdiction is "a good-faith allegation of continuous or intermittent violation." 484 U.S. at 64.

15

complaint may moot the citizen suit. See **Chesapeake Bay Found.**, 769 F.2d at 209. While the standard applied when a polluter *voluntarily* complies with the law is a formidable one,[7] the standard for evaluating a *mandatory* consent decree is more lenient: "the consent decree will moot the citizen suit, unless the citizen-plaintiff 'proves that there is a *realistic prospect* that the violations alleged in its complaint will continue notwithstanding [government enforcement].'" **Hobet Mining**, 723 F.Supp.2d at 909 (quoting **City of Dallas**, 529 F.3d at 528) (emphasis added). This more lenient standard respects Congress' intent that citizen suits supplement, rather than supplant, government action, while still reserving a role for citizen-plaintiffs to "spur enforcement of the law." **City of Dallas**, 529 F.3d at 528.

In the instant case, a legally binding Consent Decree was entered in the Webster County court in April 2011. See Defendant's Exhibit 13. Plaintiffs argue that the Consent Decree does not resolve their claims as to Order 731, and that defendant's mootness argument is premature. This Court disagrees. Plaintiffs complain that defendant failed to begin and complete construction of selenium treatment facilities by the dates set forth in Order 731. The Consent Decree sets forth a detailed schedule for implementation of such facilities that requires defendant to install technologies other than wetland systems, including ion exchange treatment and microbial reduction technologies, with start-up scale systems to be in place within 90 days from the date of the Consent Decree. The Consent Decree requires defendant to make regular reports to WVDEP regarding those treatment

---

[7]"The defendant must demonstrate that it is *absolutely clear* the alleged wrong behavior could not reasonably be expected to recur." **Gwaltney**, 484 U.S. at 66 (internal quotations omitted) (emphasis in original); see also **City of Dallas**, 529 F.3d at 527.

systems and to hire an independent consultant, who will also report to WVDEP, to review and analyze the effectiveness of the treatment systems. Importantly, the Consent Decree does not bind defendant to the use of any particular technology; the schedule set forth is designed in a fashion that allows defendant and outside experts to ascertain, through testing and reporting, what sort of treatment facilities will successfully bring defendant into compliance with its effluent limitations. Noncompliance with the terms of the Consent Decree, including the schedule for implementation of all necessary treatment facilities, carries with it meaningful financial consequences that are not contingent upon the success or failure of any particular technology.

Taking all these facts into consideration, this Court holds that there is little reason to believe that any of defendant's violations related to the installation of treatment facilities will "continue in the sense that [they] will not be cured even after the remedial plan imposed by the consent decree has been fully implemented in accordance with reasonable timetables." See **Hobet Mining**, 723 F.Supp.2d at 910 (citing **City of Dallas**, 529 F.3d at 530) (internal quotations omitted). Therefore, plaintiffs' Second Claim for Relief must be dismissed as moot.

## **CONCLUSION**

For the foregoing reasons, this Court finds that Defendant's Motion to Dismiss [Doc. 6] should be, and hereby is, **GRANTED**. Accordingly, this civil action is hereby **DISMISSED** and **ORDERED STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this order to counsel of record.

**DATED:** June 29, 2011

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE